# EXHIBIT A

*01006*
**Christopher L. Deininger, Esq., No. 004271996**
DEININGER & ASSOCIATES, LLP
415 Route 10, Suite 1
Randolph, New Jersey 07869
Attorneys for Plaintiff Gustavo Moya

|  |  |
|---|---|
| GUSTAVO A. MOYA, JR.,<br><br>                                        Plaintiff,<br><br>                    v.<br><br>UNITED AIRLINES, INC.,  CHARLENE GMUNDER, ALISA ATWATER, JANE DOE I-V (these names being fictitious as their present identities are unknown); JOHN DOE I-V (these names being fictitious as their present identities are unknown); XYZ CORPORATION I-V (these names being fictitious as their present identities are unknown),<br><br>                                        Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION, ESSEX COUNTY<br><br>DOCKET NO.:  ESX-L-_____<br><br>*Civil Action*<br><br>**COMPLAINT & JURY DEMAND** |

Plaintiff GUSTAVO A. MOYA, JR. ("Moya" and/or "plaintiff"), by and through his attorneys DEININGER & ASSOCIATES, LLP, as and for his Complaint against the defendants, says the following:

## NATURE OF ACTION & INTRODUCTION

1.       This is an action seeking equitable and legal relief for: (1) violations of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. ("CEPA"); (2) violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD") (Sexual Orientation Discrimination, Religious Discrimination & Retaliation); and (3) material contract breach.

2.       Moya is one of numerous present and form employees of defendant United Airlines, Inc. ("United") to have been subjected to patterns and practices within United through which Moya suffered injury, harm, unlawful retaliation, harassment, and constructive discharge, for voicing objections, making

reports, and/or refusing to participate in, approve, authorize or condone, materially unsafe food preparation, processing, and storage practices, through which United intentionally, recklessly, and/or negligently disbursed food and food products containing life-threatening pathogen, to passengers flying into and/or out of Newark Liberty International Airport ("EWK Airport"), including but not limited to foods and food products which tested "positive" for listeria, which is generally known to cause sickness, ill health, death, fetal demise, and other serious, lift-threatening injury.

3.       United's mistreatment of Moya included acts of unlawful discrimination against him including but not limited to unlawful discrimination based upon Moya's sexual orientation and religious beliefs.

4.       Moya is party to a binding and enforceable employment contract with United, which United breached materially through its acts and omissions, including but not limited to material breach of the covenant of good faith and fair dealing.

5.       Moya has suffered, and is continuing to suffer, serious and severe injury and harm including but not limited to career disruption, economic loss, emotional stress injury, physical illness arising from stress, and other injury and harm, all of which as were directly and/or proximately cause by the unlawful acts and omissions of United and the other defendants, including unlawful actions by United's upper management employees who knowing participated in causing harm and injury to Moya.

### **JURISDICTION & VENUE**

6.       Subject matter jurisdiction is vested in this Court because the claims and causes of action asserted herein arise under New Jersey law; are based upon acts and omission committed within the geographic boundaries of the State of New Jersey, committed by actors residing and/or doing business within the geographic boundaries of the State of New Jersey.

7.        Personal jurisdiction is vested in this Court because the parties reside and/or do business

2

within the geographic boundaries of the State of New Jersey.  Additionally, Plaintiff has satisfied all perquisites necessary to bring these claims.

8.      Venue is appropriate in this Court because Moya worked in Essex County, New Jersey, United has an office and does business in Essex County, New Jersey, and causes of action asserted herein occurred in Essex County, New Jersey.

## PARTIES & OTHER ACTORS

### Facts Concerning Plaintiff Moya

9.      Plaintiff Moya is a 38-year-old male, born on March 22, 1980, residing in West New York, New Jersey.

10.     Moya's race is white Hispanic, born of immigrant parents from the Dominican Republic.

11.     Moya's religious orientation is Catholic, which Moya practices non-charismatically.

12.     Moya is homosexual.

13.     Moya has worked in the food service industry for at least 15 years.

14.     Moya was hired by defendant United on June 2, 2014 and commenced working for United in Newark, New Jersey at a United facility located at 330 Metroplex Road, Newark, NJ 07114.

15.     Moya's was hired as a *Training Manager* for food services and was promoted to *Food Safety Manager (Level 4) PCQI* in September 2016.

16.     Prior to the that he began experiencing unlawful retaliation and/or unlawful discrimination, Moya was consistent given accolades and high ratings in performance reviews from United.  Moya was rated, in sum and substance, "exceeds expectation"; was given pay raises; was given bonuses; other performance-based rewards.

17.     When first join United, Moya was paid approximately $55,000 a year in base salary, which

3

as of today has risen to approximately $72,000 a year in base pay due to his superior job performance.

**Facts Concerning Defendant United**

18.     United is a corporation organized and existing under the law of the State of Delaware, with office in New Jersey and numerous other states and locales, including offices at 233 S. Wacker Drive, Chicago, IL 60606.

19.     At all times relevant hereto, United has conducted and is continuing to conduct substantial business within the geographic boundaries of the State of New Jersey as a foreign corporation registered with and authorized to do business in New Jersey.

20.     United is the world's third-largest commercial airline offering thousands of daily, commercial, domestic and internationally flights; generating revenue in excess of US$37,000,000,000 in 2017; owning assets valued in excess of US$42,000,000,000 in 2017; and employing, worldwide more than 86,000 people.

21.     United has a storied past of committing acts and omissions, both within and outside of the food service area of its operations, which were illegal, unlawful, and/or in violation of applicable law, rules, and regulations, and/or otherwise violated important public policies.

22.     For example, United was fined more than $2.4 millions in connection with charges brought against the company for committing bribery through the airlines establishment of the "*Chairman's Flight*" through which United curried favor with disgraced, former New Jersey /New York Port Authority Chairman David Samson, Esq.

23.     Turning to the area of food preparation and food safety, United has a significant track record of serious violations of federal, state, and local food health law, rules and regulations spanning many years.

24.     In or about October 2017, for example, United was operating a food preparation operation in Denver, Colorado under the d/b/a "Journey Cuisine," which facility was subjected to an extended shut

4

down by the FDA after listeria was discovery not only in the food being prepared for passengers but also through the catering facility.

25.      FDA had issued a 483 violation notice to United dated February 1, 2017, based upon FDA inspections conducted between January 12 and February 1, 2016. The 483 violation notice documented the discoveries at United's "Journey Cuisine" Denver facility made despite United's effort to hide the problem by subjecting the facility to numerous, multi-day "deep cleanings" orchestrated by one or more United upper management employees who attempting to mislead the FDA by eliminating the filthy conditions in the few days immediately before the FDA descended upon the United facility for an emergency inspection.

26.      On or about September 14, 2017, United was notified of Listeria Monocytogenes in food product produce by United's Denver facility.  Under FDA, United was required to report that finding to the FDA within 24 hours.  But United intentionally waited seven days before providing that notice to the FDA.

27.      Upon information and belief, United is considered by the FDA to be a bad actor when it comes to serious food safety violations causing or potentially causing sickness, death and significant harm to United's passengers.

28.      Referring exclusively to its business operations in New Jersey, upon information and belief, United conducts in excess of 400 daily commercial flights into and out of EWK Airport; employs more than 1200 persons residing in New Jersey and/or reporting to work at facilities operated by United in New Jersey; generates tens-of-millions of dollars of revenue through its New Jersey business activities; and owns and/or stored tens-of-millions of dollars of assets in New Jersey.

29.      EWK Airport is one of United's largest international hubs and includes United's catering operations which is one of United's largest catering operation in its worldwide operation.  For purposes of this pleading, United's EWK Airport catering operations will be referenced, at times as "UA EWK

5

Catering."

30.      At UA EWK Catering, United utilizes more than 1000 catering employees responsible for preparing (at peak times) up to 45,000 meals a day which are served by flight attendants to United commercial passengers, U.S. armed forces personnel flying on United military charter flight, and/or United private charter flights (including flight for the NFL, major league baseball and the NBA).

31.      There are numerous complaints presently pending against UA EWK Catering, including multiple complaints filed with the FDA, a complaint filed with OSHA, and a complaint filed with EEOC.

**Facts Concerning The Other Defendants & Other Relevant Actors**

32.      During the relevant time period, Jimmy Samartzis ("Samartzis") was United's *Vice President of Catering Operations*.  Samartzis was a member of United's upper management.

33.      During the relevant time period, Jill Eshbaugh ("Eshbaugh") was and remains United's *Vice President of Human Resources & Employee Engagement*.  Eshbaugh is a member of United's upper management.

34.      During the relevant time period, Kate Gebo ("Gebo") is currently United's *Senior Vice President of Human Resources*, and United's former *Senior Vice President of Customer Experience*.  Gebo is a member of United's upper management.

35.      During the relevant time period, Scott Kirby ("Kirby") was and remains the *President* of United.  Kirby is a member of upper management.

36.      During the relevant time period, Greg Hart ("Greg Hart") was and remains the *Chief Operating Officer* of United.  Greg Hart is a member of upper management.

37.      During the relevant time period, Brett Hart, Esq. ("Brett Hart") was and remains the *Executive Vice President, CAO & General Counsel* of United.  Brett Hart is a member of upper management.

6

38.     During the relevant time period, defendant Charlene Gmunder ("Gmunder") replaced Samartzis as United's *Vice President of Catering Operations*.  Gmunder is a member of United's upper management.

39.     Commencing in or about February 2017 and continuing at all times relevant hereto, Eliot R. Mosby ("Mosby") was hired by as its *Managing Director – GM Catering Operation (EWK and EWR)*. Upon information and belief, Mosby is a resident of Wood Ridge, New Jersey who, like Lee, reported serious wrongdoing to United regarding its food safety practices and suffered unlawful retaliation as a result, and who suffered unlawful discrimination by United, including retaliation in the form of being stripped of job duties and being transferred to Chicago – away from the food safety problems existing at UA EWK Catering.  On Friday September 9, 2018, Mosby commenced a plenary action in this Court against United, Samartzis, Pineda and others, asserting claims and causes of action under CEPA and the LAD (the "Mosby Lawsuit").  Upon information and belief, the transactions and occurrences alleged in the Mosby Lawsuit are substantially similar to, and overlapping with, those alleged here.

40.     During the relevant time period, Marcia Lee ("Lee") was and remains a single mother who maintains her New Jersey residence in the city of West New York, New Jersey.  On Monday September 10, 2018, Lee commenced a plenary action in this Court against United and others, asserting claims and causes of action under CEPA and the LAD (the "Lee Lawsuit").  Upon information and belief, the transactions and occurrences alleged in the Lee Lawsuit are substantially similar to, and overlapping with, those alleged here.

41.     Upon information and belief, at times relevant to this Complaint, Mike Landers ("Landers") was employed by United as its *Managing Director Global Catering Operations*, which included responsibility for UA EWK Catering.  Upon information and belief, Landers is a resident of Indiana who, like Lee, Mosby and Moya, reported serious wrongdoing to United regarding its food safety practices and suffered unlawful retaliation as a result.

7

42.     Commencing in or about October 2016 and continuing thereafter through to the date of this pleading, defendant Alisia Atwater ("Atwater") was United's *Director of Regulatory Compliance – Food Safety.* Atwater is a member of United's upper management.

43.     Upon information and belief, Atwater is also a religious person who looks down upon, and discriminates against, persons whom she believes "need religion," "need Jesus," and/or otherwise fail in her mind to have religious or spiritual beliefs aligned with those she holds.

44.     Upon information and belief, Atwater also is a homophobe who looks down upon, and discriminates against, persons whom she perceived (rightly or wrongly) to be gay and/or otherwise having a non-traditional sexual orientation.

45.     Upon information and belief, based upon her belief that Moya and another United employee (Eliot Mosby) were homosexuals, Atwater unlawfully discriminated and retaliated against each of them, with the knowledge and support of United's other upper management employees, including but not limited to some or all of the United upper management employees identified previously herein.

46.     At relevant times hereto, the United upper management employees identified previously herein were and/or remained senior management level employees who controlled Moya's workplace and supervise him. They each: (1) aided United in performing a wrongful act that caused Plaintiff to suffer injuries; (2) were generally aware of their role as part of an illegal or tortious activity at the time they provided assistance; and (3) knowingly and substantially assisted United in the principal violation of the statutes referenced in this Complaint.

47.     During the relevant time period, JOHN DOES I-V and JANES DOES I-V are currently unknown employees who were either senior management level employees who controlled Plaintiff's workplace and supervised Plaintiff and aided and/or abetted in the commission of conduct complained of in this Complaint and/or who acted within the scope of their employment at the workplace, or, to the extent

they went beyond the scope of their employment, Defendants ratified, embraced and added to their conduct. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

48.      During the relevant time period, XYZ Corporations I-V were unknown affiliated corporations or entities or other corporations who have liability for the claims set forth in this Complaint. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual entities by name.

49.      All defendants are thus subject to suit under the statutes pled above.

50.      At all times referenced in this Complaint, employees of the individual defendants referred to in this Complaint were acting within the scope of their respective employment or the Corporate Defendant(s) ratified, embraced and added to their conduct to the extent that their actions went beyond the scope of their employment.


## FACTUAL ALLEGATIONS

51.      During and in connection with Moya's employment with United, Moya's compensation package has including: (a) salary at the current rate of $72,000 per annum; (b) restricted stock and grants; (c) a 401K with employer matching contribution; (d) annual bonus payouts; (e) high-end healthcare insurance benefits; (f) flight benefits for himself and his designated beneficiaries;  (g) life and disability insurance; (h) discounts for goods and services including cars, homes, banking and valuable things; and (i) other valuable forms of compensation, perks, and benefits.   Plaintiff conservatively values that compensation package at least $175,000 per annum.

52.      In his employment role as United's *Level 4 Food Safety Manager*, Moya was responsible for preventive controls related to food safety for food produced by United, and/or produced by United's

9

vendors, for human consumption.

53.     Moya's job, among other tasks, was to identify, report, verify, validate, record, and follow-up on food safety compliance issues and operating procedures, for United's Newark, New Jersey catering facilities (there are two).  Moya also responsible to track and trend food borne illness and food foreign object claims for United's global operation.

54.     In his former role as United's *Training Manager*, Moya was responsible for designing, implementing, and conducting all training courses inclusive of regulatory-compliant required training and non-regulatory compliant training, for all of United's catering operation employees, including upper management.

55.     Moya's experience gave him a high level of knowledge and insight on the proper, safe handling of food for human consumption, including supply chain, facilities structure, and equipment operation.

56.     Commencing in or about October 2016 and continuing thereafter through at least until August 26, 2018 (when he was stripped of his job duties), Plaintiff perceived and uncovered numerous food critical food safety and life safety issues, which needed to be addressed and remedied by United on an emergent basis, in order to avoid the risk of potential food contamination likely to cause life-threatening harm to United passengers and United's employees.

57.     The issues referenced above concerning actual and potential serious violations of food safety laws, rules, regulations, codes, and policies of the FDA, the U.S. Government, the State of New Jersey, the New York – New Jersey Port Authority, the County of Essex, and/or the City of Elizabeth; as well as matters of important public policy, including but not limited to such matters as worker safety.

58.     Plaintiff repeatedly reported those matters to United by reporting them to United's responsible upper management employees, verbally and in writing, for the purpose of protecting United's

food catering employees and the flying public from actual or potential food safety harm.

59.     Wherever possible from Plaintiff's perspective, Plaintiff include with his reports viable, food safety focus solutions capable of resolving the issues expeditiously, appropriately, and in compliance with the applicable food safety laws, rules, regulations, codes, and policies; thereby enabling United to reduce the harmful risks to the effected public, within acceptable levels mandated by the applicable regulatory authorities.

60.     United and its upper management employees repeatedly committed acts and omissions of unlawful retaliation against Moya adverse to his employment, as a direct and proximate result of Moya's reports, causing Moya injury and damage, including but not limited to physical manifestations of harm arising from stress, harassment, and abuse.

61.     Separate and apart from the unlawful retaliation United and its upper management directed against Moya in violation of CEPA,

### Examples of Reported Incidents

#### Failure to Cure Refrigeration & Infrastructure Reported Problems

62.     Commencing on or about October 2016, Plaintiff assessed and report to United upper management employees multiple, significant problems impacting the operations of UA EWK Catering, namely: (a)  a lack of adequate refrigeration for the largest food production areas; (2) collapsed drains which are breeding grounds for bacteria; and (3) a pressing need for additional resources to support critical, immediate food safety initiative without which United would remain in material violation of applicable law, rules, codes, and regulations involving food safety and worker safety.

63.     United's catering operation relies upon the use of extremely large, industrial coolers in which the hundreds of Newark-based employees work while, simultaneously, food is stored.

64.     Plaintiff reported to United's upper management employees that United had intolerable

11

conditions with several of its coolers and collapsed drains which constituted major public health and safety risks.  Thereafter, Plaintiff discovered that United had known about those problems at least since 2010.

65.     To safely store food and prevent the growth of airborne bacteria that can contaminate food, coolers must be kept at temperatures of 40 degrees (Fahrenheit) or below. Any cooler that maintains temperatures of higher than 40 degrees but lower than 140 degrees is at risk for the growth of dangerous bacteria, including the deadly form of bacteria known as Listeria Monocytogenes.

66.     Plaintiff utilized microbiological testing and results in conjunction with his direct observation to uncover and report that United's largest and most important coolers at Newark International Airport – Cooler 7 – was in such a condition as to present a material, immediate risk to public health due to non-compliance with applicable regulatory sanitary standards.

67.     Cooler 7, which is approximately 7,500 square feet, is the cooler used to produce and store 90% of the foods United serves on its international flights out of Newark (e.g., United's largest international flight service).

68.     Plaintiff discovered and reported to United that Cooler 7 was continuing to operate the proper controls and supervision, required to adequately produce food for human consumption, including its lack of refrigeration, lack of continuous monitoring, and infrastructure deficiencies.

69.     For example, Cooler 7 could not maintain a temperature below 40 degrees; actual temperature was 55-60 degrees.

70.     Cooler 5, which is approximately 1,530 square feet, was subject to the same issues which Plaintiff reported to United's upper management, inclusive of repetitive, positive "hits" for listeria in both spaces, from Zone 2 through Zone 4.

71.     Plaintiff asked for additional resources and requested time to remedy those problems in Cooler 7 and Cooler 5, but United failed and refused to provide any of that support or the requested resources.

12

72.     Additionally, Plaintiff learned that United refused to repair collapsed drains in the Newark International Airport catering areas, which presented yet another health risk to United's passengers and employees.

73.     Beginning in February 2017, and continuously thereafter through the filing of this Complaint, Plaintiff disclosed to his supervisor Atwater conditions that he reasonably believed violated Food and Drug Administration ("FDA") regulations and were generally unsafe. Specifically, Plaintiff brought to the attention of management the deplorable state of the coolers and collapsed drains at the Newark facility. Plaintiff's supervisors continually ignored or failed to act upon Plaintiff's numerous disclosures.

### The Jyoti Incident

74.     In or about February 2017, at or about the time when Mosby joined United,  during routine product food safety sampling at UA EWK Catering, sample results tested by an independent lab came back unsatisfactory for food safety purposes for one of United's key outside prepared-meal vendors, Jyoti Natural Foods, Inc. ("Jyoti").

75.     Together with Lee, Plaintiff inspected the facility at issue and provided United with guidance as to the material manner in which the facility was in violation of food safety law, rules, codes, regulations, and/or standards because it was unsanitary, improperly equipped, and unable to operate in compliance due to unfinished facilities renovation / construction.

76.     The issues identified by Lee and Plaintiff demonstrated a material possibility that unsafe food from Jyoti, contaminated with harmful, potentially fatal bacteria, could imminently be placed into the food supply chain for United's passengers flying out of Newark.

77.     Plaintiff Moya reported the problem to Atwater and/or others in upper management at United, whereupon Atwater was resistant to taking corrective action despite the serious food safety risks presented.

13

78.     In violation of the spirit if not also the letter of food safety law, rules, codes, regulations and/or safe practices, Atwater initiated a plan to disguise and/or hide the material food safety risks at risk the issue by alerting Jyoti to the fact that Plaintiff was being sent over to conduct swabbing of microbiological niches, so that Jyoti could attempt to deep clean the facility to obscure unsafe food handling conditions.

79.     Prior to Plaintiff's arrival at Jyoti for that second round of sampling, Atwater advised Jyoti that Plaintiff was coming for the purpose of enabling Jyoti could clean the facility with bleach before Plaintiff arrived, in an effort to hide the problematic unsanitary and unsafe conditions impacting the food was providing to United.

80.     Based upon his discovery during the second inspection at Jyoti that Jyoti had undertaken efforts to disguise and/or hide its food safety problems from him by destroying evidence through the bleach cleaning, and his ongoing concerns that Jyoti's unsanitary and unsafe practices threatened to cause serious harm to United's passengers, Plaintiff determined that it was necessary for United to terminate its vendor-vendee relationship with Jyoti.

81.     When Moya proceeded with the termination of Jyoti, Atwater actively interfered with the termination and sought to block it from occurring, in contradiction to the best interests of United's passengers likely to suffer food poisoning from if/when tainted Jyoti food was served on United flights.

82.     Ultimately Jyoti's vendor-vendee relationship with United was terminated due to Plaintiff's efforts, despite Atwater's reckless and improper efforts to stop that from occurring.

### Other Examples of Plaintiff's CEPA Complaints

83.     Within the same time frame, Plaintiff alerted United upper management to issues specific to vendor DFS and Rajbhog, based on microbiological unsatisfactory results inclusive of food products contaminated with Listeria still in the supply chain and served globally, despite Plaintiff's repeated

14

objections to upper management.

84.     These same vendors continue to supply approximately 60% of United's food for consumption on board flights leaving Newark, with the knowledge of Atwater and other member of United's upper management, including United's in-house legal counsel.

85.     Regarding kosher food service, Plaintiff along with Lee conducted an inspection of United's food vendor, Bornstein, in or about June 2017.  That inspection showed unfavorable, unsatisfactory, out-of-compliance, unsanitary conditions at Bornstein, documented through photograph evidence.

86.     Plaintiff report the Bornstein issues to Atwater and United's in-house legal counsel.

87.     As of the date of this pleading, no corrective action has been taken by United, which is being permitted to allow that unsafe condition to continue with the knowledge of Atwater and other member of United's upper management, including United's in-house legal counsel.


### LAD Violations

88.     In or about June 2017, Plaintiff and Mosby attended a United EQUAL BRG event held in Terminal C, Gate 73, at Newark Airport.

89.     EQUAL BRG is a business resource group for United's LGBTQ community, through which United employees can network, and give or receive professional advice and support.

90.     Plaintiff and Mosby were attending that event for business purpose of promoting catering operations to be a resource for the EQUAL BRG including, for example, providing food service.

91.     Plaintiff and Mosby have never had any relationship beyond that of manager and employee.

92.     Following the event, Atwater questioned Plaintiff as to why he had attended that event, indicating to him that she did not approve of attendance.

15

93.      Atwater's attitude towards Plaintiff materially changed after Atwater that Plaintiff was a member of United's EQUAL BRG, based upon Atwater's perception that Plaintiff was homosexual.

94.      Plaintiff was involved in a meeting with Atwater and Lee in or about March 2, 2017, in New Jersey to discuss UA EWK Catering and its food safety issues, which were material

95.      Upon information and belief, after Plaintiff was excused from the meeting, Atwater continued to meet with Lee during which meeting Atwater advised Lee, in expressed language, that Atwater did not approve of Plaintiff's homosexual "lifestyle"; and communicated to Lee that she (Atwater) took exception to what she perceived to be Plaintiff's personality due to Atwater's belief that it was flamboyant.

96.      Upon information and belief, in another meeting with Atwater, in reference to Plaintiff's sexual orientation, Atwater advised Lee of Atwater's opinion that Moya needed to "find God" and/or "find Jesus", referencing Atwater's belief that God could cure Plaintiff of his sexual orientation, and that Plaintiff was a sinner due to his sexual orientation.

97.      Upon information and belief, based upon her perception that Plaintiff was homosexual, Atwater instructed lee to fire Plaintiff.

98.      Upon information and belief, Lee refused  based upon her perception that Plaintiff was a highly-valued United employee and was United's most knowledgeable food safety manager for regulatory compliance at UA EWK Catering.

99.      Upon information and belief, in connection with Lee's employee-personnel review of Plaintiff, Atwater directed Lee to purposefully deflate her ratings of Plaintiff by reporting, in sum and substance, that Plaintiff "failed to meet expectations."

100.      Upon information and belief, Lee refused based upon her perception that Plaintiff's job performance easily qualified at the level of "meets expectations," if not higher.

101.       Atwater was directing Lee to single out and mistreat Plaintiff, in connection with his United employment, due to his sexual orientation as well as his reports of food safety violations occurring

at UA EWK Catering.

102.     Plaintiff himself observed Atwater mistreating Plaintiff based upon his sexual and religious orientation.

103.     For example, at a meeting in March 2018 held in Newark New Jersey, Atwater publicly told Plaintiff in the presence of United employees her unlawful opinion that Plaintiff "needs Jesus," after which Plaintiff filed a complaint against Atwater with United's human resources department.

104.     In retaliation to Plaintiff that report, and for purposes of unlawfully discrimination against Plaintiff based his sexual orientation and religious orientation, in or about 14 days later, Atwater gave Plaintiff a negative performance review for the year ending 2017 – the first instance wherein Plaintiff ever received an unsatisfactory rating in a job review.

105.     Atwater's discriminatory and retaliatory purpose for giving Plaintiff that review is evidenced further by the fact that: (a) Atwater did not include Mosby in the review process for year-end-2017 even though Mosby worked with Plaintiff on a daily basis; (b) Atwater ignored Lee's prior positive review of Plaintiff's job performance for the first six-months of 2017; and (c) Plaintiff's actual job performance which was exemplary.

106.     Discrimination of that nature by Atwater against Plaintiff continued into the Plaintiff's most-recent United job review which occurred in August 2018, which Atwater intended to utilize to terminate Plaintiff's employment unlawfully, based upon false circumstances and false records.

**Atwater's False Report of Inspection Dates**

107.     In or about October 2017, Atwater showed Plaintiff a document in which Atwater wrote false and incorrect dates for inspections allegedly conducted by Plaintiff.

108.     Plaintiff immediately objected to Atwater multiple times that dates were incorrect, but Atwater refused to take corrective action.

109.     Plaintiff deeply concerned that the false information which Atwater was intentionally failing to correct, was going to be used cover up Atwater's failure to take mandatory corrective action and implicate Plaintiff as a potential criminal wrongdoer.

110.     Plaintiff was forced to immediately contact United's in-house Labor Relations Attorney, to report the Atwater's conduct and request an immediate investigation.

111.     Upon information and belief, Atwater was advised of Plaintiff's report and further retaliated against him as a result.

**Final CEPA Reports & Acts of Harassment**

112.     As a result of United's continuing failure and refusal address the numerous, critical reports Plaintiff made concern food safety issues and worker safety issues, on or about July 23, 2018, Plaintiff filed a comprehensive complaint with the FDA detailing all of the critical, food safety violations he was aware of as ongoing violation at UA EWK Catering.

113.     Upon information and belief, United became aware of Plaintiff's filing of that FDA complaint at or about the time it was filed.

114.     On August 2, 2018, Plaintiff himself disclosed his FDA complaint filing to United by email Plaintiff personally sent to Greg Hart, Kirby, Gebo, Brett Hart, and Gmunder.

115.     Upon information and belief, Atwater was immediately advised by one or more of those individuals that Plaintiff filed that FDA complaint.

116.     On August 6, 2018, after he was advised of Plaintiff filing of the FDA complaint, Atwater had it disclosed to Plaintiff that: (a) Plaintiff was being put on a 45-day action plan which, if Plaintiff failed to satisfy, was likely to lead to his termination; (b) Plaintiff was being stripped of his job duties; (c) Blocked Plaintiff from participating in emails, meetings, and other associative, work-related activities; and (d) took other unlawful retaliatory actions against Plaintiff adverse to his employment.

117.     Immediately following that review, United forced Plaintiff to commence and continue a work schedule without breaks, where Plaintiff was being forced to worked up 24-hours a day, deriving him of sleep, rest, breaks, meals, and other necessities causing his physical health to commence deterioration. Plaintiff's newly developed medical conditions include: (a) Malnutrition; (b) Dehydration; (c) Hyper-tension; (d) Cardia Arrhythmia including tachycardia; (e) Dangerously high blood pressure; (f) insomnia; (g) emotional injury and trauma; and (h) other serious and severe medical condition.

118.     Plaintiff was required to seek immediate medical treatment and was placed on a series of medications.

119.     Plaintiff advised United of his health issues, which United ignored and failed to reasonably accommodate.

120.     On or about August 15, 2018, the UA EWK Catering facility received "positive" findings for Listeria Monocytogenes, causing Plaintiff to report to Atwater and other United upper management that United must immediately suspend the use of Cooler 7, which Plaintiff insisted had to be shut down immediately.

121.     On or about August 24, 2018, UA EWK Catering was subjected to a Port Authority Department of Health inspection which confirmed the existence of six-pages of critical, food safety violations believed to put the public at imminent risk of serious harm and/or death.

122.     That same day, United direct Plaintiff that he would be working nights, the graveyard shift, commencing immediately, seven days a week.

123.     On or about August 26, 2018, at 5:45 a.m., Plaintiff issued another report to Atwater and others, advising of the persistent, unlawful food safety conditions at UA EWK Catering, requesting immediate support resources, and recommending that UA EWK Catering immediately cease operations as controls for food safety and worker safety were not present.

124.     During this time period, United would not allow Plaintiff to leave the premises, requiring

19

him to work shifts that extended in excess of 24 hours.

125.     On or about August 27, 2018, Plaintiff was asked to meet with Atwater and Gmunder privately, where Plaintiff was advised that effective immediately he was "officially" relieved on any all duties at UA EWK Catering; and was being immediately transferred to Chicago to an unidentified office in the corporate headquarters.

126.     Plaintiff resisted, advising Atwater and Gmunder again of his medical condition and pre-arranged medical appointments in New Jersey which Plaintiff could neither delay nor miss; and advising them of the emotional and financial hardship such a retaliatory transfer would impose upon him.

127.     Gmunder and Atwater nevertheless directed Plaintiff to pack and take his personal belongings, say goodbye to his employees, and to report to Chicago at 9 a.m. the following Monday.

128.     Thereafter, Plaintiff left the facility under intense emotional distress, having been constructively fired from his job in Newark, New Jersey, and directed to report to a new, undescribed job hundreds of miles away, on impossible short notice.

129.     Plaintiff was advised by his treating physician that Plaintiff could not medically tolerate continuing to work at this time, whereupon Plaintiff advise United of that fact and filed to FMLA leave.

130.     As of the date of this Complaint, United has not responded to Plaintiff's FMLA request.

131.     Each of the aforementioned actions by Gmunder, Atwater, and United were for the purpose of unlawfully retaliation, unlawful discrimination, and/or material breach of contract, against Plaintiff.

132.     More than a week after he suspended working for United to take medical leave, Plaintiff learned for the first time that, as part of her homophobic discrimination and harassment of Plaintiff, Atwater secretly accused Plaintiff of having a personal sexual relationship with Mosby and commenced an "investigation" against Plaintiff to endeavor to demonstrate that Plaintiff's reports were due to some sort of "homosexual conspiracy" between Plaintiff and Mosby.

20

133.     Learning that information was particularly injurious and damaging to Plaintiff, because throughout his career at United Plaintiff was sure always to maintain and abide by the highest professional standards, which included never mixing his business relationships with private personal ones.

134.     Atwater's false, homophobic accusation was extremely damaging to Plaintiff's reputation within United and within the airline food service management industry (which is small).

135.     Atwater intentionally failed and refused to provide Plaintiff with the resources reasonably needed for Plaintiff to discharge his job duties on behalf of United, while she intentionally harassed Plaintiff and subjected him to unlawful workplace hostility for purposes of discrimination and retaliation on United's behalf.

136.     Atwater on multiple occasions failed to report and disclose to regulatory agencies and/or traveling public United's exposure of its passengers to contaminated product with Listeria Monocytogenes. When Plaintiff alerted Atwater to such details,  Atwater intentionally intensified United's retaliation and hostile actions which included forcing Plaintiff to perform additional work with unrealistic timelines, forcing Plaintiff to work unreasonable additional hours and weekends.

137.     United unreasonably failed to provide adequate, supervision, training, control, monitoring, and/or investigation of Atwater and/or Gmunder, each of whom were committing intentional, unlawful acts and omissions against Plaintiff, on behalf of United.

138.     As a direct and proximate result and consequence of the defendants' wrongful and unlawful acts, actions and omissions, Plaintiff has suffered and is continuing to suffer serious emotional distress, related physical harm, financial loss, economic loss, loss of employment benefits, loss of employment perks (including life-time free air travel for himself, his parents, and his dependents), loss of insurance and/or degradation of insurance coverage, and other harm and loss which is serious and severe.

139.     As of the date of this pleading, upon information and belief, Plaintiff's damages exceed US$7,500,000.

## FIRST COUNT

**(New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq.)**

140. Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

141. Plaintiff complained about, objected to and refused to participate in illegal and unethical conduct by Defendants.

142. Plaintiff reported the substandard and unsafe food safety conditions and participated in his coworkers' disclosure of those unlawful and illegal acts and omissions to appropriate regulatory authorities, including but not limited to the FDA.

143. Thereafter, defendants retaliated against Plaintiff because of his valid complaints of illegal and unethical conduct and refusal to participate in such illegal and unethical conduct, including but not limited to all of the forms of unlawful retaliation stated previously in this pleading.

144. As a direct and proximate result of the acts and omissions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment and other emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy his life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

145. Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

   **WHEREFORE**, as to each and every count, Plaintiff demands judgment on each and all of these Counts against each and every one of the defendants, jointly and severally, as follows:

   A. Compensatory damages;

   B. Damages for lost wages and benefits (including health, dental and prescription care benefits

coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C. Damages for humiliation, mental and emotional distress;

D. Statutory damages;

E. Punitive damages and liquidated damages;

F. Attorneys' fees and costs of suit;

G. Lawful interest – including pre-judgment interest on lost wages;

H. Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I. Such other, further and different relief as the Court deems fitting, just and proper.


## **SECOND COUNT**

### **(New Jersey Law Against Discrimination)**

146. Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

147. Plaintiff is a member of several protected classes under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD") based upon his religious faith and sexual orientation.

148. Defendant United Airlines is an "employer" as defined under the LAD.

149. Plaintiff was harassed as a result of his protected statuses and/or perceived protected statuses.

150. Upon information and belief, as of April 2017 United received numerous reports identifying acts by Atwater which were inappropriate, improper, and/or unlawful under the LAD, Title VII and/or other civil rights laws, rules and regulations.

151. Upon information and belief, through its upper management, as of April 2017 United knew of Atwater's predisposition to acting in a discriminatory manner; of her predisposition to make insensitive and inappropriate remarks to and about people concerning their protected characteristics;

23

and of her particular insensitivity to persons she perceived to be less religious than herself, based upon the other persons faith, lifestyle, sexual identity and/or sexual orientation.

152.   United failed to take appropriate corrective action as to Atwater, instead permitting her to continue with her unlawful, upper management conduct in violation of the LAD.

153.   In violation of their obligations under LAD, Defendants' Human Resources staff failed to take appropriate action to protect Plaintiff, to discipline the other defendants, and/or other unlawful acts and omissions.

154.   The foregoing facts and circumstances demonstrate that the defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by discriminating against Plaintiff.

155.   As a direct and proximate result of the actions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment and other emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy his life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

156.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

**WHEREFORE**, as to each and every count, Plaintiff demands judgment on each and all of these Counts against each and every one of the defendants, jointly and severally, as follows:

A.   Compensatory damages;

B.   Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C.   Damages for humiliation, mental and emotional distress;

24

D.  Statutory damages;

E.  Punitive damages and liquidated damages;

F.  Attorneys' fees and costs of suit;

G.  Lawful interest – including pre-judgment interest on lost wages;

H.  Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.  Such other, further and different relief as the Court deems fitting, just and proper.


## THIRD COUNT

### (New Jersey Law Against Discrimination - Retaliation)

157.  Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

158.  The foregoing facts and circumstances demonstrate that defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by retaliating against Plaintiff for engaging in the protected activity.

159.  As a direct and proximate result of the actions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment and other emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy his life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

160.  Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

   **WHEREFORE**, as to each and every count, Plaintiff demands judgment on each and all of these Counts against each and every one of the defendants, jointly and severally, as follows:

A.  Compensatory damages;

B.  Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C.  Damages for humiliation, mental and emotional distress;

D.  Statutory damages;

E.  Punitive damages and liquidated damages;

F.  Attorneys' fees and costs of suit;

G.  Lawful interest – including pre-judgment interest on lost wages;

H.  Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.  Such other, further and different relief as the Court deems fitting, just and proper.

## **FOURTH COUNT**

### **(Material Contract Breach)**

161.  Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

162.  Plaintiff and United were parties to a binding employment agreement, supported by good and valuable consideration (the "Agreement").

163.  The Agreement included an obligation that United render its contractual performance in good faith, and in a manner that would neither interfere, hamper, or deny Plaintiff the performances he bargained to receive.

164.  Plaintiff rendered material performance of any and all obligations he had under the Agreement and had discharged or otherwise satisfied any and all conditions precedent to his entitlement to United's full and complete, good faith performances under the Agreement.

165.  United material breached the Agreement by and through its acts and omissions, including but not

limited to the following: (a) United forced Plaintiff to involuntarily resign from employment with United; (b) United unlawfully harassed, retaliated against, and discriminated against Plaintiff for purposes of interfering with, hampering, and/or denying Plaintiff the performances he bargained to receive.

166. As a direct and proximate result and consequence of the defendants' wrongful and unlawful acts, actions and omissions, Plaintiff has suffered and is continuing to suffer serious emotional distress, related physical harm, financial loss, economic loss, loss of employment benefits, loss of employment perks (including life-time free air travel for himself, his parents, and his dependents), loss of insurance and/or degradation of insurance coverage, and other harm and loss which is serious and severe.

**WHEREFORE**, as to each and every count, Plaintiff demands judgment on each and all of these Counts against each and every one of the defendants, jointly and severally, as follows:

A. Compensatory damages;

B. Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C. Damages for humiliation, mental and emotional distress;

D. Statutory damages;

E. Punitive damages and liquidated damages;

F. Attorneys' fees and costs of suit;

G. Lawful interest – including pre-judgment interest on lost wages;

H. Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

27

I.   Such other, further and different relief as the Court deems fitting, just and proper.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Gustavo Moya

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 11, 2018

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Gustavo Moya

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 11, 2018

## DESIGNATION OF TRIAL COUNSEL

Please take notice that pursuant to R. 4:25-4, Christopher L. Deininger, Esq. is

hereby designated as trial counsel in the within matter.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Gustavo Moya

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 11, 2018

## CERTIFICATION PURSUANT TO RULE 4:5-1

The undersigned, Christopher L. Deininger, Esq., certifies on behalf of the Plaintiff as follows:

1.     I am an attorney admitted to practice law in the State of New Jersey, counsel for the above-named Plaintiff in the subject action.

2.     The matter in controversy in this case is not, to my knowledge, the subject of any other action pending in any Court or pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated.

3.     There are no other parties who should be joined in this action that we are aware of at the present time.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DEININGER & ASSOCIATES, LLP
Attorneys for Gustavo Moya

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 11, 2011

# Civil Case Information Statement

**Case Details: ESSEX | Civil Part Docket# L-006430-18**

**Case Caption:** MOYA GUSTAVO  VS UNITED AIRLINES, INC .

**Case Initiation Date:** 09/11/2018

**Attorney Name:** CHRISTOPHER LOUIS DEININGER

**Firm Name:** DEININGER & ASSOCIATES, LLP

**Address:** 415 ROUTE 10, STE 1

RANDOLPH NJ 07869

**Phone:**

**Name of Party:** PLAINTIFF : Moya, Gustavo

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Case Type:** LAW AGAINST DISCRIMINATION (LAD) CASES

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Hurricane Sandy related?** NO

**Is this a professional malpractice case?**  NO

**Related cases pending:** YES

**If yes, list docket numbers:** ESX-L-006332-18 (Mosby v. United)

and ESX-L-006386-18 (Lee v. United)

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** YES

---

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Employer/Employee

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO

    **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO

    **If yes, for what language:**

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

| | |
|---|---|
| 09/11/2018 | /s/ CHRISTOPHER LOUIS DEININGER |
| Dated | Signed |

*01006*
**Christopher L. Deininger, Esq., No. 004271996**
DEININGER & ASSOCIATES, LLP
415 Route 10, Suite 1
Randolph, New Jersey 07869
Attorneys for Plaintiff Gustavo Moya

| | |
|---|---|
| GUSTAVO A. MOYA, JR., <br><br> Plaintiff, <br><br> v. <br><br> UNITED AIRLINES, INC., CHARLENE GMUNDER, ALISA ATWATER, JANE DOE I-V (these names being fictitious as their present identities are unknown); JOHN DOE I-V (these names being fictitious as their present identities are unknown); XYZ CORPORATION I-V (these names being fictitious as their present identities are unknown), <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION, ESSEX COUNTY <br><br> DOCKET NO.: ESX-L-006430-18 <br><br> *Civil Action* <br><br> ***FIRST AMENDED & CORRECTED*** <br> ***COMPLAINT & JURY DEMAND*** |

Plaintiff GUSTAVO A. MOYA, JR. ("Moya" and/or "plaintiff"), by and through his attorneys DEININGER & ASSOCIATES, LLP, as and for his Complaint against the defendants, says the following:

## <u>NATURE OF ACTION & INTRODUCTION</u>

1.       This is an action seeking equitable and legal relief for: (1) violations of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. ("CEPA"); (2) violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD") (Sexual Orientation Discrimination, Religious Discrimination & Retaliation); and (3) material contract breach.

2.       Moya is one of numerous present and form employees of defendant United Airlines, Inc. ("United") to have been subjected to patterns and practices within United through which Moya suffered

1

injury, harm, unlawful retaliation, harassment, and constructive discharge, for voicing objections, making reports, and/or refusing to participate in, approve, authorize or condone, materially unsafe food preparation, processing, and storage practices, through which United intentionally, recklessly, and/or negligently disbursed food and food products containing life-threatening pathogens, to passengers flying into and/or out of Newark Liberty International Airport ("EWK Airport"), including but not limited to foods and food products which tested "positive" for listeria, which is generally known to cause sickness, ill health, death, fetal demise, and other serious, life-threatening injury.

3.      United's mistreatment of Moya included acts of unlawful discrimination against him including but not limited to unlawful discrimination based upon Moya's sexual orientation and religious beliefs.

4.      Moya is party to a binding and enforceable employment contract with United, which United breached materially through its acts and omissions, including but not limited to material breach of the covenant of good faith and fair dealing.

5.      Moya has suffered, and is continuing to suffer, serious and severe injury and harm including but not limited to career disruption, economic loss, emotional stress injury, physical illness arising from stress, and other injury and harm, all of which as were directly and/or proximately cause by the unlawful acts and omissions of United and the other defendants, including unlawful actions by United's upper management employees who knowingly participated in causing harm and injury to Moya.

## JURISDICTION & VENUE

6.      Subject matter jurisdiction is vested in this Court because the claims and causes of action asserted herein arise under New Jersey law, are based upon acts and omission committed within the geographic boundaries of the State of New Jersey, committed by actors residing and/or doing business within the geographic boundaries of the State of New Jersey.

7.      Personal jurisdiction is vested in this Court because the parties reside and/or do business within the geographic boundaries of the State of New Jersey.  Additionally, Plaintiff has satisfied all perquisites necessary to bring these claims.

8.      Venue is appropriate in this Court because Moya worked in Essex County, New Jersey, United has an office and does business in Essex County, New Jersey, and causes of action asserted herein occurred in Essex County, New Jersey.

## PARTIES & OTHER ACTORS

### Facts Concerning Plaintiff Moya

9.      Plaintiff Moya is a 38-year-old male, born on March 22, 1980, residing in West New York, New Jersey.

10.      Moya's race is white Hispanic, born of immigrant parents from the Dominican Republic.

11.      Moya's religious orientation is Catholic, which Moya practices non-charismatically.

12.      Moya is homosexual.

13.      Moya has worked in the food service industry for at least 15 years.

14.      Moya was hired by defendant United on June 2, 2014 and commenced working for United in Newark, New Jersey at a United facility located at 330 Metroplex Road, Newark, NJ 07114.

15.      Moya's was hired as a *Training Manager* for food services and was promoted to *Food Safety Manager (Level 4) PCQI* in September 2016.

16.      Prior to the time that he began experiencing unlawful retaliation and/or unlawful discrimination, Moya was consistently given accolades and high ratings in performance reviews from United.  Moya was rated, in sum and substance, "exceeds expectation"; was given pay raises; was given bonuses; and other performance-based rewards.

3

17.     When he first joined United, Moya was paid approximately $55,000 a year in base salary, which as of today has risen to approximately $72,000 a year in base pay due to his superior job performance.

**Facts Concerning Defendant United**

18.     United is a corporation organized and existing under the law of the State of Delaware, with offices in New Jersey and numerous other states and locales, including offices at 233 S. Wacker Drive, Chicago, IL 60606.

19.     At all times relevant hereto, United has conducted and is continuing to conduct substantial business within the geographic boundaries of the State of New Jersey as a foreign corporation registered with and authorized to do business by the State of New Jersey.

20.     United is the world's third-largest commercial airline offering thousands of daily, commercial, domestic and internationally flights; generating revenue in excess of US$37,000,000,000 in 2017; owning assets valued in excess of US$42,000,000,000 in 2017; and employing, worldwide more than 86,000 people.

21.     United has a storied past of committing acts and omissions, both within and outside of the food service area of its operations, which were illegal, unlawful, and/or in violation of applicable law, rules, and regulations, and/or otherwise violated important public policies.

22.     For example, United was fined more than $2.4 millions in connection with charges brought against the company for committing bribery through the airlines establishment of the "*Chairman's Flight*" through which United curried favor with disgraced, former New Jersey /New York Port Authority Chairman, David Samson, Esq.

23.     Turning to the area of food preparation and food safety, United has a significant track record of serious violations of federal, state, and local food health law, rules and regulations spanning many years.

4

24.      In or about October 2017, for example, United was operating a food preparation operation in Denver, Colorado under the d/b/a "Journey Cuisine," which facility was subjected to an extended shut down by the FDA after listeria was discovery not only in the food being prepared for passengers but also throughout other areas of the catering facility.

25.      FDA had issued a 483 violation notice to United dated February 1, 2017, based upon FDA inspections conducted between January 12 and February 1, 2016. The 483 violation notice documented the discoveries at United's "Journey Cuisine" Denver facility made despite United's effort to hide the problem by subjecting the facility to numerous, multi-day "deep cleanings" orchestrated by one or more United upper management employees who attempting to mislead the FDA by eliminating the filthy conditions in the few days immediately before the FDA descended upon the United facility for an emergency inspection.

26.      On or about September 14, 2017, United was notified of Listeria Monocytogenes in food product produce by United's Denver facility.  Under FDA regulations, United was required to report that finding to the FDA within 24 hours.  But United intentionally waited seven days before providing that notice to the FDA.

27.      Upon information and belief, United is considered by the FDA to be a bad actor when it comes to serious food safety violations causing or potentially causing sickness, death and significant harm to United's passengers.

28.      Referring exclusively to its business operations in New Jersey, upon information and belief, United conducts in excess of 400 daily commercial flights into and out of EWK Airport; employs more than 1200 persons residing in New Jersey and/or reporting to work at facilities operated by United in New Jersey; generates tens-of-millions of dollars of revenue through its New Jersey business activities; and owns and/or stores tens-of-millions of dollars of assets in New Jersey.

29.      EWK Airport is one of United's largest international hubs and includes United's catering

operations which is one of United's largest catering operation in its worldwide operation. For purposes of this pleading, United's EWK Airport catering operations will be referenced, at times, as "UA EWK Catering."

30.    At UA EWK Catering, United utilizes more than 1000 catering employees responsible for preparing (at peak times) up to 45,000 meals a day which are served by flight attendants to United commercial passengers, U.S. armed forces personnel flying on United military charter flight, and/or United private charter flights (including flights for the NFL, for Major League Baseball and for the NBA).

31.    There are numerous complaints presently pending against UA EWK Catering, including multiple complaints filed with the FDA, a complaint filed with OSHA, and a complaint filed with the EEOC.

**Facts Concerning The Other Defendants & Other Relevant Actors**

32.    During the relevant time period, Jimmy Samartzis ("Samartzis") was United's *Vice President of Catering Operations*. Samartzis was a member of United's upper management.

33.    During the relevant time period, Jill Eshbaugh ("Eshbaugh") was and remains United's *Vice President of Human Resources & Employee Engagement*. Eshbaugh is a member of United's upper management.

34.    During the relevant time period, Kate Gebo ("Gebo") is currently United's *Senior Vice President of Human Resources*, and United's former *Senior Vice President of Customer Experience*. Gebo is a member of United's upper management.

35.    During the relevant time period, Scott Kirby ("Kirby") was and remains the *President* of United. Kirby is a member of upper management.

36.    During the relevant time period, Greg Hart ("Greg Hart") was and remains the *Chief Operating Officer* of United. Greg Hart is a member of upper management.

6

37.     During the relevant time period, Brett Hart, Esq. ("Brett Hart") was and remains the *Executive Vice President, CAO & General Counsel* of United.   Brett Hart is a member of upper management.

38.     During the relevant time period, defendant Charlene Gmunder ("Gmunder") replaced Samartzis as United's *Vice President of Catering Operations*.   Gmunder is a member of United's upper management.

39.     Commencing in or about February 2017 and continuing at all times relevant hereto, Eliot R. Mosby ("Mosby") was hired by United as its *Managing Director – GM Catering Operation (EWK and EWR)*.   Upon information and belief, Mosby is a resident of Wood Ridge, New Jersey who, like Lee, reported serious wrongdoing to United regarding its food safety practices and suffered unlawful retaliation as a result, and who suffered unlawful discrimination by United, including retaliation in the form of being stripped of job duties and being transferred to Chicago – away from the food safety problems existing at UA EWK Catering.   On Friday September 9, 2018, Mosby commenced a plenary action in this Court against United, Samartzis, Pineda and others, asserting claims and causes of action under CEPA and the LAD (the "Mosby Lawsuit").   Upon information and belief, the transactions and occurrences alleged in the Mosby Lawsuit are substantially similar to, and overlapping with, those alleged here.

40.     During the relevant time period, Marcia Lee ("Lee") was and remains a single mother who maintains her New Jersey residence in the city of West New York, New Jersey.   On Monday September 10, 2018, Lee commenced a plenary action in this Court against United and others, asserting claims and causes of action under CEPA and the LAD (the "Lee Lawsuit").   Upon information and belief, the transactions and occurrences alleged in the Lee Lawsuit are substantially similar to, and overlapping with, those alleged here.

41.     Upon information and belief, at times relevant to this Complaint, Mike Landers ("Landers") was employed by United as its *Managing Director Global Catering Operations*, which

7

included responsibility for UA EWK Catering.  Upon information and belief, Landers is a resident of Indiana who, like Lee, Mosby and Moya, reported serious wrongdoing to United regarding its food safety practices and suffered unlawful retaliation as a result.

42.    Commencing in or about October 2016 and continuing thereafter through to the date of this pleading, defendant Alisia Atwater ("Atwater") was United's *Director of Regulatory Compliance – Food Safety.*  Atwater is a member of United's upper management.

43.    Upon information and belief, Atwater is also a religious person who looks down upon, and discriminates against, persons whom she believes "need religion," "need Jesus," and/or otherwise fail in her mind to have religious or spiritual beliefs aligned with those she holds.

44.    Upon information and belief, Atwater also is a homophobe who looks down upon, and discriminates against, persons whom she perceived (rightly or wrongly) to be gay and/or otherwise having a non-traditional sexual orientation.

45.    Upon information and belief, based upon her belief that Moya and another United employee (Eliot Mosby) were homosexuals, Atwater unlawfully discriminated and retaliated against each of them, with the knowledge and support of United's other upper management employees, including but not limited to some or all of the United upper management employees identified previously herein.

46.    At relevant times hereto, the United upper management employees identified previously herein were and/or remained senior management level employees who controlled Moya's workplace and supervise him.  They each: (1) aided United in performing a wrongful act that caused Plaintiff to suffer injuries; (2) were generally aware of their role as part of an illegal or tortious activity at the time they provided assistance; and (3) knowingly and substantially assisted United in the principal violation of the statutes referenced in this Complaint.

47.    During the relevant time period, JOHN DOES I-V and JANES DOES I-V are currently

unknown employees who were either senior management level employees who controlled Plaintiff's workplace and supervised Plaintiff and aided and/or abetted in the commission of conduct complained of in this Complaint and/or who acted within the scope of their employment at the workplace, or, to the extent they went beyond the scope of their employment, Defendants ratified, embraced and added to their conduct. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

48.     During the relevant time period, XYZ Corporations I-V were unknown affiliated corporations or entities or other corporations who have liability for the claims set forth in this Complaint. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual entities by name.

49.     All defendants are thus subject to suit under the statutes pled above.

50.     At all times referenced in this Complaint, employees of the individual defendants referred to in this Complaint were acting within the scope of their respective employment or the entity defendants ratified, embraced and added to their conduct to the extent that their actions went beyond the scope of their employment.

## FACTUAL ALLEGATIONS

51.     During and in connection with Moya's employment with United, Moya's compensation package has including: (a) salary at the current rate of $72,000 per annum; (b) restricted stock and grants; (c) a 401K with employer matching contribution; (d) annual bonus payouts which can be as high as 150% of his salary; (e) high-end healthcare insurance benefits; (f) flight benefits for himself and his designated beneficiaries; (g) life and disability insurance; (h) discounts for goods and services including cars, homes, banking and valuable things; and (i) other valuable forms of compensation, perks, and benefits. Plaintiff

9

conservatively values that compensation package at least $175,000 per annum.

52.     In his employment role as United's *Level 4 Food Safety Manager*, Moya was responsible for preventive controls related to food safety for food produced by United, and/or produced by United's vendors, for human consumption.

53.     Moya's job, among other tasks, was to identify, report, verify, validate, record, and follow-up on food safety compliance issues and operating procedures, for United's Newark, New Jersey catering facilities (there are two).  Moya also responsible to track and trend food borne illness and food foreign object claims for United's global operation.

54.     In his former role as United's *Training Manager*, Moya was responsible for designing, implementing, and conducting training courses inclusive of regulatory-compliant required training and non-regulatory compliant training, for all of United's catering operation employees, including upper management.

55.     Moya's experience gave him a high level of knowledge and insight on the proper, safe handling of food for human consumption, including supply chain, facilities structure, and equipment operation.

56.     Commencing in or about October 2016 and continuing thereafter through at least until August 26, 2018 (when he was stripped of his job duties), Plaintiff perceived and uncovered numerous critical food safety and life safety issues, which needed to be addressed and remedied by United on an emergent basis, in order to avoid the risk of potential food contamination likely to cause life-threatening harm to United passengers and United's employees.

57.     The issues referenced above concerning actual and potential serious violations of food safety laws, rules, regulations, codes, and policies of the FDA, the U.S. Government, the State of New Jersey, the New York – New Jersey Port Authority, the County of Essex, and/or the City of Elizabeth; as

well as matters of important public policy, including but not limited to such matters as worker safety.

58.     Plaintiff repeatedly reported those matters to United by reporting them to United's responsible upper management employees, verbally and in writing, for the purpose of protecting United's food catering employees and the flying public from actual or potential food safety harm, and to protect United employees.

59.     Wherever possible from Plaintiff's perspective, Plaintiff include with his reports viable, food safety focused solutions capable of resolving the issues expeditiously, appropriately, and in compliance with the applicable food safety laws, rules, regulations, codes, and policies; thereby enabling United to cost-effectively reduce the harmful risks to the effected public, within acceptable levels mandated by the applicable regulatory authorities.

60.     United and its upper management employees repeatedly committed acts and omissions of unlawful retaliation against Moya adverse to his employment, as a direct and proximate result of Moya's reports, causing Moya injury and damage, including but not limited to physical manifestations of harm arising from stress, harassment, and abuse.

61.     Separate and apart from the unlawful retaliation United and its upper management directed against Moya in violation of CEPA, the defendants also discriminated against Plaintiff, unlawfully, in violation of the LAD.

**Examples of Reported Incidents**

       **Failure to Cure Refrigeration & Infrastructure Reported Problems**

62.     Commencing on or about October 2016, Plaintiff assessed and report to United upper management employees multiple, significant problems impacting the operations of UA EWK Catering, namely: (a)  a lack of adequate refrigeration for the largest food production areas; (2) collapsed drains

11

which are breeding grounds for bacteria; and (3) a pressing need for additional resources to support critical, immediate food safety initiative without which United would remain in material violation of applicable law, rules, codes, and regulations involving food safety and worker safety.

63.     United's catering operation relies upon the use of extremely large, industrial coolers in which the hundreds of Newark-based employees work while, simultaneously, food is stored.

64.     Plaintiff reported to United's upper management employees that United had intolerable conditions with several of its coolers and collapsed drains which constituted major public health and safety risks.  Thereafter, Plaintiff discovered that United had known about those problems at least since 2010.

65.     To safely store food and prevent the growth of airborne bacteria that can contaminate food, coolers must be kept at temperatures of 40 degrees (Fahrenheit) or below. Any cooler that maintains temperatures of higher than 40 degrees but lower than 140 degrees is at risk for the growth of dangerous bacteria, including the deadly form of bacteria known as Listeria Monocytogenes.

66.     Plaintiff utilized microbiological testing and results in conjunction with his direct observations to uncover and report that United's largest and most important coolers at Newark International Airport – Cooler 7 – was in such a condition as to present a material, immediate risk to public health due to non-compliance with applicable regulatory sanitary standards.

67.     Cooler 7, which is approximately 7,500 square feet, is the cooler used to produce and store 90% of the foods United serves on its international flights out of Newark (e.g., United's largest international flight service).

68.     Plaintiff discovered and reported to United that Cooler 7 was continuing to operate without the proper controls and/or supervision necessary to adequately produce food for human consumption, including its lack of refrigeration, lack of continuous monitoring, and infrastructure deficiencies.

69.     For example, Cooler 7 could not maintain a temperature below 40 degrees and, instead, had an actual operating temperature of 55-60 degrees.

12

70.     Cooler 5, which is approximately 1,530 square feet, was subject to the same issues which Plaintiff reported to United's upper management, inclusive of repetitive, positive "hits" for listeria in both spaces, from Zone 2 through Zone 4.

71.     Plaintiff asked for additional resources and requested time to remedy those problems in Cooler 7 and Cooler 5, but United failed and refused to provide any of that support or the requested resources.

72.     Additionally, Plaintiff learned that United refused to repair collapsed drains in the Newark International Airport catering areas, which presented yet another health risk to United's passengers and employees.

73.     Beginning in February 2017, and continuously thereafter through the filing of this Complaint, Plaintiff disclosed to his supervisor Atwater conditions that he reasonably believed violated Food and Drug Administration ("FDA") regulations and were generally unsafe. Specifically, Plaintiff brought to the attention of management the deplorable state of the coolers and collapsed drains at the Newark facility. Plaintiff's supervisors continually ignored or failed to act upon Plaintiff's numerous disclosures.

### The Jyoti Incident

74.     In or about February 2017, at or about the time when Mosby joined United,  during routine product food safety sampling at UA EWK Catering, sample results tested by an independent lab came back unsatisfactory for food safety purposes for one of United's key outside prepared-meal vendors, Jyoti Natural Foods, Inc. ("Jyoti").

75.     Together with Lee, Plaintiff inspected the facility at issue and provided United with guidance as to the material manner in which the facility was in violation of food safety law, rules, codes, regulations, and/or standards because it was unsanitary, improperly equipped, and unable to operate in compliance due to unfinished facilities renovation / construction.

13

76.     The issues identified by Lee and Plaintiff demonstrated a material possibility that unsafe food from Jyoti, contaminated with harmful, potentially fatal bacteria, could imminently be placed into the food supply chain for United's passengers flying out of Newark.

77.     Plaintiff Moya reported the problem to Atwater and/or others in upper management at United, whereupon Atwater was resistant to taking corrective action despite the serious food safety risks presented.

78.     In violation of the spirit if not also the letter of food safety law, rules, codes, regulations and/or safe practices, Atwater initiated a plan to disguise and/or hide the material food safety risks by alerting Jyoti to the fact that Plaintiff was being sent over to conduct swabbing of microbiological niches, so that Jyoti could attempt to deep clean the facility to obscure unsafe food handling conditions.

79.     Prior to Plaintiff's arrival at Jyoti for that second round of sampling, Atwater advised Jyoti that Plaintiff was coming for the purpose of enabling Jyoti could clean the facility with bleach before Plaintiff arrived, in an effort to hide the problematic unsanitary and unsafe conditions impacting the food was providing to United.

80.     Based upon his discovery during the second inspection at Jyoti that Jyoti had undertaken efforts to disguise and/or hide its food safety problems from him by destroying evidence through the bleach cleaning, and his ongoing concerns that Jyoti's unsanitary and unsafe practices threatened to cause serious harm to United's passengers, Plaintiff determined that it was necessary for United to terminate its vendor-vendee relationship with Jyoti.

81.     When Moya proceeded to get United to terminate Jyoti, Atwater actively interfered with the termination and sought to block it from occurring, in contradiction to the best interests of United's passengers likely to suffer food poisoning from if/when tainted Jyoti food was served on United flights.

82.     Ultimately Jyoti's vendor-vendee relationship with United was terminated due to Plaintiff's efforts, despite Atwater's reckless and improper efforts to stop that from occurring.

14

### Other Examples of Plaintiff's CEPA Complaints

83.     Within the same time frame, Plaintiff alerted United upper management to issues specific to vendors DFS and Rajbhog, based on microbiological unsatisfactory results inclusive of food products contaminated with Listeria still in the supply chain and served globally, despite Plaintiff's repeated objections to upper management.

84.     These same vendors continue to supply approximately 60% of United's food for consumption on board flights leaving Newark, with the knowledge of Atwater and other member of United's upper management, including United's in-house legal counsel.

85.     Regarding kosher food service, Plaintiff along with Lee conducted an inspection of United's food vendor, Bornstein, in or about June 2017.  That inspection showed unfavorable, unsatisfactory, out-of-compliance, unsanitary conditions at Bornstein, documented through photograph evidence.

86.     Plaintiff report the Bornstein issues to Atwater and United's in-house legal counsel.

87.     As of the date of this pleading, no corrective action has been taken by United, which is being permitted to allow that unsafe condition to continue with the knowledge of Atwater and other member of United's upper management, including United's in-house legal counsel.

### LAD Violations

88.     In or about June 2017, Plaintiff and Mosby attended a United EQUAL BRG event held in Terminal C, Gate 73, at Newark Airport.

89.     EQUAL BRG is a business resource group for United's LGBTQ community, through which United employees can network, and give or receive professional advice and support.

90.     Plaintiff and Mosby were attending that event for business purpose of promoting catering

15

operations to be a resource for the EQUAL BRG including, for example, providing food service.

91.      Plaintiff and Mosby have never had any relationship beyond that of manager and employee.

92.      Following the event, Atwater questioned Plaintiff as to why he had attended that event, indicating to him that she did not approve of his attendance.

93.      Atwater's attitude towards Plaintiff materially changed after Atwater became aware that Plaintiff was a member of United's EQUAL BRG, based upon Atwater's perception that Plaintiff was homosexual.

94.      Plaintiff was involved in a meeting with Atwater and Lee in or about March 2, 2017, in New Jersey to discuss UA EWK Catering and its food safety issues.

95.      Upon information and belief, after Plaintiff was excused from the meeting, Atwater continued to meet with Lee during which meeting Atwater advised Lee, in expressed language, that Atwater did not approve of Plaintiff's homosexual "lifestyle"; and communicated to Lee that she (Atwater) took exception to what she perceived to be Plaintiff's personality due to Atwater's belief that it was flamboyant.

96.      Upon information and belief, in another meeting with Atwater, in reference to Plaintiff's sexual orientation, Atwater advised Lee of Atwater's opinion that Moya needed to "find God" and/or "find Jesus", referencing Atwater's belief that God could cure Plaintiff of his sexual orientation, and that Plaintiff was a sinner due to his sexual orientation.

97.      Upon information and belief, based upon her perception that Plaintiff was homosexual, Atwater instructed Lee to fire Plaintiff.

98.      Upon information and belief, Lee refused  based upon her perception that Plaintiff was a highly-valued United employee and was United's most knowledgeable food safety manager for regulatory compliance at UA EWK Catering.

99.      Upon information and belief, in connection with Lee's employee-personnel review of

Plaintiff, Atwater directed Lee to purposefully deflate her ratings of Plaintiff by reporting, in sum and substance, that Plaintiff "failed to meet expectations."

100.     Upon information and belief, Lee refused based upon her perception that Plaintiff's job performance easily qualified at the level of "meets expectations," if not higher.

101.      Atwater was directing Lee to single out and mistreat Plaintiff, in connection with his United employment, due to his sexual orientation as well as his reports of food safety violations occurring at UA EWK Catering.

102.     Plaintiff himself observed Atwater mistreating Plaintiff based upon his sexual and religious orientation.

103.     For example, at a meeting in March 2018 held in Newark New Jersey, Atwater publicly told Plaintiff in the presence of United employees her unlawful opinion that Plaintiff "needs Jesus," after which Plaintiff filed a complaint against Atwater with United's human resources department.

104.     In retaliation to Plaintiff's report, and for purposes of unlawfully discrimination against Plaintiff based his sexual orientation and religious orientation, in or about 14 days later, Atwater gave Plaintiff a negative performance review for the year ending 2017 – the first instance wherein Plaintiff ever received an unsatisfactory rating in a job review.

105.     Atwater's discriminatory and retaliatory purpose for giving Plaintiff that review is evidenced further by the fact that: (a) Atwater did not include Mosby in the review process for year-end-2017 even though Mosby worked with Plaintiff on a daily basis; (b) Atwater ignored Lee's prior positive review of Plaintiff's job performance for the first six-months of 2017; and (c) Plaintiff's actual job performance which was exemplary.

106.     Discrimination of that nature by Atwater against Plaintiff continued into the Plaintiff's most-recent United job review which occurred in August 2018, which Atwater intended to utilize to terminate Plaintiff's employment unlawfully, based upon false circumstances and false records.

## Atwater's False Report of Inspection Dates

107.     In or about October 2017, Atwater showed Plaintiff a document in which Atwater wrote false and incorrect dates for inspections allegedly conducted by Plaintiff.

108.     Plaintiff immediately objected to Atwater multiple times that dates were incorrect, but Atwater refused to take corrective action.

109.     Plaintiff was deeply concerned that the false information which Atwater was intentionally failing to correct, was going to be used cover up Atwater's failure to take mandatory corrective action and implicate Plaintiff as a potential criminal wrongdoer.

110.     Plaintiff was forced to immediately contact United's in-house Labor Relations Attorney, to report the Atwater's conduct and request an immediate investigation.

111.     Upon information and belief, Atwater was advised of Plaintiff's report and further retaliated against him as a result.

## Final CEPA Reports & Acts of Harassment

112.     As a result of United's continuing failure and refusal address the numerous, critical reports Plaintiff made concern food safety issues and worker safety issues, on or about July 23, 2018, Plaintiff filed a comprehensive complaint with the FDA detailing all of the critical, food safety violations he was aware of as ongoing violation at UA EWK Catering.

113.     Upon information and belief, United became aware of Plaintiff's filing of that FDA complaint at or about the time it was filed.

114.     On August 2, 2018, Plaintiff himself disclosed his FDA complaint filing to United by email Plaintiff personally sent to Greg Hart, Kirby, Gebo, Brett Hart, and Gmunder.

115.     Upon information and belief, Atwater was immediately advised by one or more of those

individuals that Plaintiff filed that FDA complaint.

116.    On August 6, 2018, after she was advised of Plaintiff filing of the FDA complaint, Atwater had it disclosed to Plaintiff that: (a) Plaintiff was being put on a 45-day action plan which, if Plaintiff failed to satisfy, was likely to lead to his termination; (b) Plaintiff was being stripped of his job duties; (c) Plaintiff would be blocked from participating in emails, meetings, and other associative, work-related activities; and (d) other actions against Plaintiff adverse to his employment.

117.    Immediately following that review, United forced Plaintiff to commence and continue a work schedule without breaks, where Plaintiff was being forced to worked up 24-hours a day, deriving him of sleep, rest, breaks, meals, and other necessities causing his physical health to commence deterioration. Plaintiff's newly developed medical conditions include: (a) Malnutrition; (b) Dehydration; (c) Hyper-tension; (d) Cardia Arrhythmia including tachycardia; (e) Dangerously high blood pressure; (f) insomnia; (g) emotional injury and trauma; and (h) other serious and severe medical condition.

118.    Plaintiff was required to seek immediate medical treatment and was placed on a series of medications.

119.    Plaintiff advised United of his newly-developing stress-related health issues, which United ignored and failed to reasonably accommodate.

120.    On or about August 15, 2018, the UA EWK Catering facility received "positive" findings for Listeria Monocytogenes, causing Plaintiff to report to Atwater and other United upper management that United must immediately suspend the use of Cooler 7, which Plaintiff insisted had to be shut down immediately.

121.    On or about August 24, 2018, UA EWK Catering was subjected to a Port Authority Department of Health inspection which confirmed the existence of six-pages of critical, food safety violations believed to put the public at imminent risk of serious harm and/or death.

122.    That same day, United direct Plaintiff that he would be working nights, the graveyard

shift, commencing immediately, seven days a week.

123.     On or about August 26, 2018, at 5:45 a.m., Plaintiff issued another report to Atwater and others, advising of the persistent, unlawful food safety conditions at UA EWK Catering, requesting immediate support resources, and recommending that UA EWK Catering immediately cease operations as controls for food safety and worker safety were not present.

124.     During this time period, United would not allow Plaintiff to leave the premises, requiring him to work shifts that extended in excess of 24 hours.

125.     On or about August 27, 2018, Plaintiff was asked to meet with Atwater and Gmunder privately, where Plaintiff was advised that effective immediately he was "officially" relieved on any all duties at UA EWK Catering; and was being immediately transferred to Chicago to an unidentified office in the corporate headquarters.

126.     Plaintiff resisted, advising Atwater and Gmunder again of his medical condition and pre-arranged medical appointments in New Jersey which Plaintiff could neither delay nor miss; and advising them of the emotional and financial hardship such a retaliatory transfer would impose upon him.

127.     Gmunder and Atwater nevertheless directed Plaintiff to pack and take his personal belongings, say goodbye to his employees, and to report to Chicago at 9 a.m. the following Monday.

128.     Thereafter, Plaintiff left the facility under intense emotional distress, having been constructively fired from his job in Newark, New Jersey, and directed to report to a new, undescribed job hundreds of miles away, on impossible short notice.

129.     Plaintiff was advised by his treating physician that Plaintiff could not medically tolerate continuing to work at this time, whereupon Plaintiff advise United of that fact and filed to FMLA leave.

130.     As of the date of this Complaint, United has not responded to Plaintiff's FMLA request.

131.     Each of the aforementioned actions by Gmunder, Atwater, and United were for the purpose of unlawfully retaliation, unlawful discrimination, and/or material breach of contract, against

Plaintiff.

132.    More than a week after he suspended working for United to take medical leave, Plaintiff learned for the first time that, as part of her homophobic discrimination and harassment of Plaintiff, Atwater secretly accused Plaintiff of having a personal sexual relationship with Mosby and commenced an "investigation" against Plaintiff to endeavor to demonstrate that Plaintiff's reports were due to some sort of "homosexual conspiracy" between Plaintiff and Mosby.

133.    Learning that information was particularly injurious and damaging to Plaintiff, because throughout his career at United Plaintiff was sure always to maintain and abide by the highest professional standards, which included never mixing his business relationships with private personal ones.

134.    Atwater's false, homophobic accusation was extremely damaging to Plaintiff's reputation within United and within the airline food service management industry (which is small).

135.    Atwater intentionally failed and refused to provide Plaintiff with the resources reasonably needed for Plaintiff to discharge his job duties on behalf of United, while she intentionally harassed Plaintiff and subjected him to unlawful workplace hostility for purposes of discrimination and retaliation on United's behalf.

136.    Atwater on multiple occasions failed to report and disclose to regulatory agencies and/or traveling public United's exposure of its passengers to contaminated product with Listeria Monocytogenes. When Plaintiff alerted Atwater to such details,  Atwater intentionally intensified United's retaliation and hostile actions which included forcing Plaintiff to perform additional work with unrealistic timelines, forcing Plaintiff to work unreasonable additional hours and weekends.

137.    United unreasonably failed to provide adequate, supervision, training, control, monitoring, and/or investigation of Atwater and/or Gmunder, each of whom were committing intentional, unlawful acts and omissions against Plaintiff, on behalf of United.

138.    As a direct and proximate result and consequence of the defendants' wrongful and

21

unlawful acts, actions and omissions, Plaintiff has suffered and is continuing to suffer serious emotional distress, related physical harm, financial loss, economic loss, loss of employment benefits, loss of employment perks (including life-time free air travel for himself, his parents, and his dependents), loss of insurance and/or degradation of insurance coverage, and other harm and loss which is serious and severe.

139.    As of the date of this pleading, upon information and belief, Plaintiff's damages exceed US$7,500,000.

## FIRST COUNT

### (New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq.)

140.   Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

141.   Plaintiff complained about, objected to and refused to participate in illegal and unethical conduct by Defendants.

142.   Plaintiff reported the substandard and unsafe food safety conditions and participated in his coworkers' disclosure of those unlawful and illegal acts and omissions to appropriate regulatory authorities, including but not limited to the FDA.

143.   Thereafter, defendants retaliated against Plaintiff because of his valid complaints of illegal and unethical conduct and refusal to participate in such illegal and unethical conduct, including but not limited to all of the forms of unlawful retaliation stated previously in this pleading.

144.   As a direct and proximate result of the acts and omissions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, physical injury and harm, pain and suffering, shame and embarrassment and other emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy his life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

145.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in his favor, and Counts against each and every one of the defendants, jointly and severally, awarding Plaintiff the following:

A.   Compensatory damages;

B.   Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C.   Damages for humiliation, mental and emotional distress;

D.   Statutory damages;

E.   Punitive damages and liquidated damages;

F.   Attorneys' fees and costs of suit;

G.   Lawful interest – including pre-judgment interest on lost wages;

H.   Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.   Such other, further and different relief as the Court deems fitting, just and proper.


## SECOND COUNT

### (New Jersey Law Against Discrimination)

146.   Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

147.   Plaintiff is a member of several protected classes under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD") based upon his religious faith and sexual orientation.

148.   Defendant United is an "employer" as defined under the LAD.

149.   The defendants caused Plaintiff to be subjected to unlawful discrimination, harassment and retaliation,

as a result of his protected statuses and/or perceived protected statuses.

150.   Upon information and belief, as of April 2017 United received numerous reports identifying acts by Atwater which were inappropriate, improper, and/or unlawful under the LAD, Title VII and/or other civil rights laws, rules and regulations.

151.   Upon information and belief, through its upper management, as of April 2017 United knew of Atwater's predisposition to acting in a discriminatory manner; of her predisposition to make insensitive and inappropriate remarks to and about people concerning their protected characteristics; and of her particular insensitivity to persons she perceived to be less religious than herself, based upon the other persons faith, lifestyle, sexual identity and/or sexual orientation.

152.   United failed to take appropriate corrective action as to Atwater, instead permitting her to continue with her unlawful, upper management conduct in violation of the LAD.

153.   In violation of their obligations under LAD, Defendants' Human Resources staff failed to take appropriate action to protect Plaintiff, to discipline the other defendants, and/or other unlawful acts and omissions.

154.   The foregoing facts and circumstances demonstrate that the defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by discriminating against Plaintiff.

155.   As a direct and proximate result of the actions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment and other emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy his life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

156.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in his favor, and Counts against each and every one of the defendants, jointly and severally, awarding Plaintiff the following:

A. Compensatory damages;

B. Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C. Damages for humiliation, mental and emotional distress;

D. Statutory damages;

E. Punitive damages and liquidated damages;

F. Attorneys' fees and costs of suit;

G. Lawful interest – including pre-judgment interest on lost wages;

H. Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I. Such other, further and different relief as the Court deems fitting, just and proper.

## THIRD COUNT

### (New Jersey Law Against Discrimination - Retaliation)

157. Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

158. The foregoing facts and circumstances demonstrate that defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by retaliating against Plaintiff for engaging in the protected activity.

159. As a direct and proximate result of the actions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment and other emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy his life.  Moreover, Plaintiff has and/or may have to incur expenses for

medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

160.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in his favor, and Counts against each and every one of the defendants, jointly and severally, awarding Plaintiff the following:

A.   Compensatory damages;

B.   Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C.   Damages for humiliation, mental and emotional distress;

D.   Statutory damages;

E.   Punitive damages and liquidated damages;

F.   Attorneys' fees and costs of suit;

G.   Lawful interest – including pre-judgment interest on lost wages;

H.   Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.   Such other, further and different relief as the Court deems fitting, just and proper.

## FOURTH COUNT

### (Material Contract Breach)

161.    Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

162.    Plaintiff and United were parties to a binding employment agreement, supported by good and valuable consideration (the "Agreement").

163.   The Agreement included an obligation that United render its contractual performance in good faith, and in a manner that would neither interfere, hamper, nor deny Plaintiff the performances he bargained to receive.

164.   Plaintiff rendered material performance of any and all obligations he had under the Agreement and had discharged or otherwise satisfied any and all conditions precedent to his entitlement to United's full and complete, good faith performances under the Agreement.

165.   United material breached the Agreement by and through its acts and omissions, including but not limited to the following: (a) United forced Plaintiff to involuntarily resign from employment with United; (b) United unlawfully harassed, retaliated against, and discriminated against Plaintiff for purposes of interfering with, hampering, and/or denying Plaintiff the performances he bargained to receive.

166.   As a direct and proximate result and consequence of the defendants' wrongful and unlawful acts, actions and omissions, Plaintiff has suffered and is continuing to suffer serious emotional distress, related physical harm, financial loss, economic loss, loss of employment benefits, loss of employment perks (including life-time free air travel for himself, his parents, and his dependents), loss of insurance and/or degradation of insurance coverage, and other harm and loss which is serious and severe.

   **WHEREFORE**, Plaintiff demands judgment in his favor, and Counts against each and every one of the defendants, jointly and severally, awarding Plaintiff the following:

   A.   Compensatory damages;

   B.   Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

   C.   Damages for humiliation, mental and emotional distress;

D.  Statutory damages;

E.  Punitive damages and liquidated damages;

F.  Attorneys' fees and costs of suit;

G.  Lawful interest – including pre-judgment interest on lost wages;

H.  Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.  Such other, further and different relief as the Court deems fitting, just and proper.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Gustavo Moya

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 12, 2018

## **JURY DEMAND**

Plaintiff demands a trial by jury as to all issues.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Gustavo Moya

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 12, 2018

28

## DESIGNATION OF TRIAL COUNSEL

Please take notice that pursuant to R. 4:25-4, Christopher L. Deininger, Esq. is

hereby designated as trial counsel in the within matter.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Gustavo Moya

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 12, 2018

29

## <u>CERTIFICATION PURSUANT TO RULE 4:5-1</u>

The undersigned, Christopher L. Deininger, Esq., certifies on behalf of the Plaintiff as follows:

1. I am an attorney admitted to practice law in the State of New Jersey, counsel for the above-named Plaintiff in the subject action.

2. The matter in controversy in this case is not, to my knowledge, the subject of any other action pending in any Court or pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated.

3. There are no other parties who should be joined in this action that we are aware of at the present time.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Gustavo Moya


By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 12, 2011

30